# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-CA-01141-SCT

*YALE MATERIALS HANDLING CORPORATION, GALBREATH INCORPORATED, GALBREATH, INC., GALBREATH COMPANIES AND GALBREATH-ESCOTT, INC.*

*v.*

*DONNA RICHARDS BRANDON, WIDOW AND PERSONAL REPRESENTATIVE OF JOHN WESLEY BRANDON, DECEASED, FOR THE BENEFIT OF THE WRONGFUL DEATH BENEFICIARIES OF JOHN WESLEY BRANDON, DECEASED, CONTINENTAL INSURANCE COMPANY AND FIDELITY & CASUALTY COMPANY OF NEW YORK*

| | |
|---|---|
| DATE OF JUDGMENT: | 9/28/1998 |
| TRIAL JUDGE: | HON. JOHN M. MONTGOMERY |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | J. GORDON FLOWERS |
| | MARC DARREN AMOS |
| | JONATHAN R. COOPER |
| | RICHARD HENRY SPANN |
| | JAMES PHILLIP WILSON |
| | JOHN M. CHRISTIAN |
| ATTORNEYS FOR APPELLEES: | R. DAVID KAUFMAN |
| | JOHN ERNEST WADE |
| | JOSEPH N. STUDDARD |
| | DAVID WAYNE BARIA |
| | DAVID O. KEMP |
| NATURE OF THE CASE: | CIVIL-WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED ON DIRECT APPEAL. REVERSED AND REMANDED ON CROSS-APPEAL 05/23/2002 |
| MOTION FOR REHEARING FILED: | 6/6/2002 |

MANDATE ISSUED:

**EN BANC.**

**McRAE, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Plaintiffs, the wrongful death beneficiaries of John Wesley Brandon, were assessed $3.5 million in compensatory damages by a Lowndes County Circuit Court jury in a product liability/wrongful death suit originating from a workplace accident involving a forklift and a trash hopper or dumpster at the Eka Nobel Chemical Plant in Lowndes County. The jury assigned 40% of the fault to Galbreath,[1] the manufacturer of the hopper; 30% to Yale Materials Handling Corporation, the manufacturer of the forklift; 15% to Eka Nobel, Brandon's employer; 5% to The Duriron Company, the distributor of the hopper; and 10% to Brandon. Duriron, which sold the hopper to Eka Nobel as part of a hazardous waste disposal system, was dismissed prior to trial after entering into a settlement with the wrongful death beneficiaries. Eka Nobel was not a named defendant inasmuch as it was exempt from suit as a statutory employer. Workers' compensation benefits were paid by Continental Insurance Company and Fidelity Casualty Company of New York which intervened in the wrongful death action.

¶2. In its special verdict form, the jury allocated 100% of the $3,500,000 damages among Brandon (10%), Galbreath (40%), Yale (30%), Duriron (5%) and Eka Nobel (15%). Before the court assessed damages in proportion to these fault percentages, it subtracted the $35,000 Duriron settlement from the $3.5 million. Then the court subtracted 10% (representing Brandon's comparative fault) of the balance of the $3.5 million. Finally, it determined what 40% and 30% of the balance would be and assessed those amounts against Galbreath and Yale. The judgment ordered Galbreath to pay $1,247,400 and Yale to pay $935,550.

¶3. On appeal to this Court, Galbreath and Yale take issue with some of the evidentiary rulings, the denial of a directed verdict, jury instructions, plaintiffs' closing argument, the conduct of jury deliberations, and the jury verdict. Plaintiffs have cross-appealed seeking a recalculation of the verdict amounts apportioned to Galbreath and Yale. Many of the issues are without merit or are procedurally barred and, therefore, will not be discussed in this opinion. Only those issues warranting analysis are included herein. We hereby affirm the judgment on direct appeal and reverse for recalculation on cross-appeal since the employer was assessed 15% fault and Duriron's 5% fault was improperly credited.

## FACTS

¶4. On January 28, 1991, Brandon's foreman asked him to dump some hoppers containing hazardous waste into a trailer for ultimate disposal. Brandon had just completed his shift and was about to leave. He obtained a Yale forklift and drove to the first hopper. Brandon and his co-worker Mike Young then secured the hopper onto the forklift with chains. Young rode a bicycle and followed the forklift to the dump site.

¶5. Two methods were used at the Eka Nobel plant to dump the hoppers. The first method was to tilt a loaded hopper back on the forklift, release the latch, elevate it, and then tilt the hopper forward, causing the hopper to discharge its contents. The second method was to elevate the loaded hopper without tilting it backwards and, while standing on the ground, a co-employee, would use an 8 to 10 foot trip rod to trip open the safety release latch to the hopper lid. The hopper was then tilted forward to dump the contents. The forklift operators were required to elevate the hoppers ten feet or more because of the height of the trailers used to haul off the waste. Eka Nobel preferred that the release for the hopper cover not be engaged prior to elevation because the hopper contents could be spilled during elevation. Apparently, the second method was commonly used to dump Galbreath hoppers.

¶6. Neither Young nor Brandon could find the 10-foot trip rod to dump the first hopper. The hopper contained a corrosive substance referred to as "cakes" consisting of a high concentration of salt. The cakes were a by-product of the manufacturing process used by Eka Nobel. To dump the first hopper, Brandon used the first method. He tilted the forks of the forklift backwards, released the hopper safety latch, elevated the hopper, and then tilted the forks forward, causing the hopper to empty its contents.

¶7. Young and Brandon then returned to pick up and secure the second hopper. Brandon instructed Young to check on something else and said he would dump the second hopper by himself. The second hopper was a Galbreath Model H-150W hopper, and the second method was used to dump it. The H-150W has a latch lock in addition to a safety release latch. The latch lock rotated clockwise, essentially blocking the safety release latch. In order for the H-150W to dump, the latch lock would have to be unlocked and the safety release latch would have to be unlatched. The H-150W is "self-dumping" in that once the latch lock and the safety release latch are opened, a loaded hopper's center of gravity will cause the hopper to tip forward on its rockers and empty its load. The hopper then rocks backwards and relatches itself. The latch lock must be disengaged before the hopper is elevated, while the safety release latch can be released when triggered by a trip rod while the hopper is elevated.

¶8. There were no eyewitnesses to the accident. After the accident occurred, co-workers found Brandon standing on the dashboard or cowling of the forklift, facing the hopper and pinned between the overhead guard and the mast[2] of the forklift. Apparently, Brandon was standing on the dashboard attempting to trigger the safety release latch when his foot came into contact with the tilt control lever and the mast tilted backwards. The engine of the forklift was running and a 3 to 3-1/2 foot pipe was found in the immediate vicinity of the forklift. The hopper's safety release latch was closed. Brandon sustained severe crushing injuries to his pelvis, bladder and urethra and died of his injuries several days later.

¶9. Plaintiffs contended that the hopper was improperly designed and unreasonably dangerous because it was not equipped with a pull rope which allows a person to pull a rope passing through a pulley, causing the safety release latch to unlatch while the operator is safely within the overhead guard. Galbreath offered the pull rope attachment as an optional feature, but the hopper in question was not equipped with the pull rope. Plaintiffs claimed that the hopper was unreasonably dangerous because it could not be dumped safely and reliably from elevated heights while the forklift operator remained in the cab, thus forcing the operator to exit the cab and use other dangerous methods to attempt to open the safety release latch to dump the elevated hopper. The forklift at issue was a Yale Model GP040.

¶10. Plaintiffs contended that the Yale forklift was unreasonably dangerous for three reasons. First, the tilt and lift controls which activated its mast were located in an unsafe position and were not adequately

protected from inadvertent contact. Second, Yale failed to design the forklift so that its users would be prevented from standing on the dashboard even though it was reasonably foreseeable that users would do so. Finally, Yale failed to provide adequate warnings and instructions to prevent users from placing themselves in dangerous positions while dumping a hopper from elevated heights even though it was reasonably foreseeable to Yale that this situation may occur.

¶11. Design alternatives proposed by plaintiffs' experts included that Yale should have relocated the forklift controls to another location; placed a shield in front of the controls; utilized some type of locking mechanism like a button that had to be pressed before the controls were activated; utilized a seat actuated hydraulic lock to lock the controls if the operator left the seat; or utilized a barrier device to keep people from actuating the controls while standing on the cowl.

¶12. Galbreath and Yale contended that Brandon, a trained and certified forklift operator, caused the accident by violating safety rules and the procedures taught him during training for the safe operation and use of the equipment, including that Brandon was negligent by failing to turn the engine off before attempting to unlatch the hopper; by attempting to dump the hopper by himself; by failing to remain inside the cab while the forklift was running; by standing on the dashboard of the forklift to unlatch the hopper; and by admittedly being in a hurry.

¶13. With respect to the defective design of the forklift, Yale argued that the location of the controls was common in the industry and did not make the forklift unreasonably dangerous, and it asserted that the plaintiffs' expert's suggestions as to the forklift's designs had never been used by any forklift manufacturer and could be dangerous. Yale also contended that Eka Nobel contributed to the incident by removing the original overhead guard and replacing it with another which significantly decreased the clearance space between the overhead guard and the mast. Further, Eka Nobel's decision to dump its hoppers over the high sides of a trailer without purchasing the optional pull rope attachment for elevated dumping contributed to the accident.

¶14. Galbreath introduced evidence of a risk-benefit analysis of the pull rope attachment which concluded that the pull rope attachment would increase risks in situations where the attachment was not needed. The rope could dangle and cause a nuisance or even be run over, causing a premature release of the hopper. If the hopper were elevated on the forklift, the forklift operator might be tempted to reach between the hopper and the forklift to pull the rope. Finally, Galbreath contended that no other manufacturer utilized a pull rope attachment as standard equipment for hoppers.

**DISCUSSION**

### I. JURY VERDICT.

### A. Was the verdict against the overwhelming weight of the evidence?

¶15. Galbreath contends that the verdict was against the overwhelming weight of the evidence. Plaintiffs contend that Galbreath is liable because the hopper had no pull-rope attachment. Galbreath asserts that the evidence presented at trial established that the absence of a pull-rope attachment for the hopper did not make the hopper defective.

¶16. To determine if a verdict is against the overwhelming weight of the evidence,

this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial. Only when the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal.

*Herrington v. Spell,* 692 So.2d 93, 103-04 (Miss. 1997).

¶17. We find that the jury verdict was amply supported by credible evidence. The remedial measures taken and the pre-accident warnings given by Galbreath and Yale show that they knew of the hazards of operating the forklift and hopper in the manner used by Brandon. In essentially a "battle of the experts," Brandon's experts unequivocally stated that the pull rope attachment should have been standard equipment instead of optional and that if the pull rope attachment had been on the hopper in question, the accident could have been avoided. It is obvious that the jury believed Brandon's experts over those of Yale and Galbreath. The jury's allocation of 10% of the liability to Brandon indicates that it considered Brandon's negligence. The evidentiary and jury instruction rulings complained of by Yale and Galbreath did not infect the trial with undue prejudice and bias.

### B. Was the verdict the result of bias, passion and prejudice?

¶18. Yale contends that the jury verdict evinced bias, passion and prejudice because the award exceeded plaintiffs' damage request by $1.2 million and its allocation of fault was half of that suggested by plaintiffs' attorneys. During closing argument, plaintiffs' counsel asked for $2,303,324 in actual damages and to assign Brandon 20% of the fault. The jury awarded $503,324 in economic damages and $2,996,676 in non-economic damages, for a total of $3.5 million, and found Brandon to be 10% at fault. The closing argument does not limit the jury from awarding more damages than requested, and the jury's pronounced departure from what was requested, even when compared with the evidence before the jury, does not support the claims of prejudice.

¶19. We find that the jury's verdict did not evince bias, passion and prejudice and that the jury's finding that Galbreath and Yale were liable was supported by substantial credible evidence. Therefore, the jury's allocation of 40% of the fault to Galbreath and 30% of the fault to Yale is not excessive. The evidence and jury instructions complained of by Yale and Galbreath did not render the trial unfair.

¶20. The jury impaneled by the parties was the weigher of facts. Its finding that Brandon was 10% liable was certainly supported by the evidence. Likewise, the damages awards by the jury should not be disturbed unless they are "flagrantly outrageous and extravagant, where they have no standard by which to ascertain the excess." *Detroit Marine Eng'g v. McRee*, 510 So.2d 462, 471 (Miss. 1987). The verdict and damages awards are supported by the evidence and cannot be said to be outrageous or extravagant. The verdict was not the result of bias, passion or prejudice; and therefore, it stands.

### II. JURY INSTRUCTIONS

### A. Jury Instruction No. DG-19 (refused)

¶21. Galbreath complains that the trial court should have given its proffered instruction concerning knowledge of danger as precluding a failure to warn as follows:

If a person knows of a danger, a warning cannot increase his awareness of its presence, and where a

warning would not have prevented the harm, a failure to warn cannot be the proximate cause of the injury.

If you believe from a preponderance of the evidence that [Brandon] knew that one should never put his body between the mast and overhead guard of a forklift while standing on the dash or cowling with the forklift engine running then a specific warning regarding the pinch point would not have increased the plaintiff's awareness of the danger. Therefore, a specific written warning about the pinch point would not have prevented the harm, and the lack of such a warning could not have been the proximate cause of the plaintiff's injury.

Galbreath argues that manufacturers are not required to warn of dangers that are open and obvious, ***Toney v. Kawasaki Heavy Indus. Ltd.***, 763 F. Supp. 1356, 1360 (S.D. Miss. 1991), *aff'd*, 975 F.2d 162 (5th Cir. 1992), and that if the jury found that Brandon should have known not to stand on the dashboard, a warning would have been moot. The trial court refused to give the instruction on the basis it was repetitive.

¶22. We have stated that if something is open and obvious to the plaintiff, it is also open and obvious to the defendant. *See **Horton v. American Tobacco Co.***, 667 So.2d 1289, 1300 (Miss.1995); ***Tharp v. Bunge Corp***., 641 So.2d 20, 25 (Miss. 1994). Plaintiffs argue that other instructions adequately explained that the jury could consider Brandon's "ability to avoid danger by the exercise of due care in the use of the hopper as designed"; Brandon was negligent by placing himself between the mast and the overhead guard; the jury could find that Brandon's negligence was the sole proximate cause of his injuries and death; and comparative negligence instructions were given. The court instructed the jury that if Brandon "would have suffered the same injuries and ultimately died if the warning labels had been replaced, then the alleged failure to replace the labels should not be considered by you in determining whether Galbreath is liable under strict liability or negligence." The jury found Brandon to be 10% negligent. Obviously the jury considered Brandon's negligence in returning the verdict. The trial court did not err in refusing the requested instruction.

### III. RULINGS ON EVIDENTIARY MATTERS.

### A. Admission of investigative report containing hearsay.

¶23. Ron Good, a safety engineer employed by Eka Nobel, investigated the accident. Good interviewed Bobby Smith, an Eka Nobel employee, who stated that, although he had never personally observed such, he had heard that other people had stood on the dashboard of the forklift and used a short rod to release the safety release latch on the hopper for dumping. Based on this conversation, Good's report stated, "It has since been learned that a number of other plant employees have attempted the same maneuver violating a rule of safe forklift operation. This illustrates a learned, unsafe behavior that has been allowed to continue and eventually someone would get hurt." Yale argues that this statement was based on "hearsay within hearsay" or "triple hearsay." The trial court overruled the objection, finding that the evidence constituted an exception to the hearsay rule and that other evidence of negligence had been introduced. The trial court stated:

The motion in limine in regard to excluding portions of the report prepared by Mr. Ronald Wayne Good is [denied]. The Court finds that it is an exception to the hearsay rule and also the Court has allowed evidence of negligence, alleged negligence on the part of Eka Nobel and this report was made by an employee of Eka Nobel, and in the interest of justice, the Court feels that it would be best to allow the entire report to come in and it will be given. The Court will instruct the jury that they can

give it whatever weight and worth they feel that it should be given and the motion in limine is [denied].

¶24. Because the trial court stated that it had allowed evidence of Eka Nobel's negligence and that the report was made by an employee of Eka Nobel, we will assume that the exception to the hearsay rule referred to by the trial court is that of a declaration against interest. However, plaintiffs argue that the report was trustworthy and therefore an exception to the hearsay exclusionary rule inasmuch as it was generated in the regular course of business.

¶25. The foundational requirements for business records are that (1) the statement is in written or recorded form; (2) the record concerns acts, events, conditions, opinions or diagnoses; (3) the record was made at or near the time of the matter recorded; (4) the source of the information had personal knowledge of the matter; (5) the record was kept in the course of regular business activity; and (6) it was the regular practice of the business activity to make the record. M.R.E. 803. *See also Flowers v. State*, 773 So.2d 309, 331-32 (Miss. 2000). The comments to M.R.E. 803 state that there must be testimony from a foundational witness to provide evidence of the foundation requirements. *See also id.*

¶26. In the case at bar, Good testified that he was the safety engineer at Eka Nobel on the date of the accident. When he arrived at the accident scene, Brandon, who was conscious, had been removed from the forklift and was lying on the ground. Eka Nobel supervisors requested that Good prepare an accident investigation report, and he did so within the next two days. We therefore find that the report was generated during the regular course of business and was admissible under M.R.E. 803.

¶27. The evidence contained in the report tends to confirm plaintiffs' allegation that Galbreath and Yale knew that the forklift and hopper would be operated in the way that Brandon was using them, and that they should have therefore modified their designs. There is other evidence in the record to prove that Galbreath and Yale should have known of the dangerous way in which Eka Nobel employees used the equipment. For instance, Yale modified the design of other forklifts prior to Brandon's accident, moving the controls from the dashboard to the area around the base of the seat. Furthermore, Galbreath published advertisements showing the hopper in question elevated ten feet off the ground by a forklift demonstrating that one of the hopper's intended uses was dumping at elevated heights. Therefore, Galbreath was aware that industrial workers would attempt to dump the hoppers while elevated, and that if the pull rope attachment was not standard equipment, other means of unlatching the hopper would be utilized.

¶28. Good's report was generated in the regular course of business, and the jury heard other evidence of reasonable foreseeability on the part of Yale and Galbreath.

### B. Evidence of misuse of the forklift by Eka Nobel employees.

¶29. Brandon's widow testified that Ed Adkins, an Eka Nobel employee, told her that the method Brandon was using to dump the hopper had "been done a million times before." Yale and Galbreath objected on the grounds that the testimony was hearsay and was not covered by any relevant exception. The trial court ruled that the statement was admissible because it was an admission against interest. Yale claims that this ruling was reversible error because Eka Nobel was not a party; and therefore, its agent could not be making an admission against interest.

¶30. Adkins's statement was a *declaration* against interest, not an *admission* against interest because neither Adkins nor Eka Nobel were parties to the suit. *See, e.g., Clay v. Int'l Harvester Co.*, 674 So.2d

398, 408-09 (La. 1996). Therefore, M.R.E. 804(b)(3) applies. M.R.E. 804(b)(3) provides that a declaration against interest may be admissible as an exception to the hearsay rule "if the declarant is unavailable as a witness." Because plaintiffs did not show that either Adkins or Eka Nobel (through its corporate representatives) was unavailable to testify at trial, the declaration against interest constituted inadmissible hearsay. Nevertheless, the erroneous admission of this testimony cannot be said to unfairly and substantially prejudice Galbreath and Yale because other evidence of foreseeability and misuse was admitted. At best, it was harmless error.

## IV. RECALCULATION OF APPORTIONMENT OF DAMAGES.

¶31. On cross-appeal, plaintiffs contend that the trial court incorrectly credited Galbreath and Yale twice for Brandon's comparative negligence and for the amount of Duriron's settlement; in other words, the trial court erred by subtracting Duriron's settlement and Brandon's 10% allocation of fault prior to multiplying the balance by the percentages allocated to Galbreath and Yale.

¶32. First, we note that the allocation of fault and apportionment of damages are separate calculations. The jury is required by Miss. Code Ann. § 85-5-7(7)(1999) to allocate the percentage of fault for all parties alleged to be at fault. However, fault should not be allocated to employers who are immune from liability by virtue of our workers' compensation laws. *See Accu-Fab & Constr., Inc. v. Ladner,* 778 So.2d 766, 770 (Miss. 2001). Therefore, the trial court erroneously instructed the jury to allocate fault to Eka Nobel, the statutory employer of Brandon.

¶33. Also, the settlement reached in this case should not have been credited before the proportionate damage amounts were calculated respecting Yale and Galbreath, the non-settling defendants. *See Krieser v. Hobbs*, 166 F.3d 736 (5th Cir. 1999)(where a non-settling defendant was found 50% liable and was held responsible for $100,000 of the $200,000 verdict, even though plaintiff settled with the other defendant, who was also 50% liable, for $650,000). Also, pursuant to § 85-5-7, where fault has been apportioned between settling and non-settling defendants, the non-settling defendants remain liable for the amount of damages allocated in direct proportion to each one's percentage of fault. While it is true that we have adopted the settlement-first method of damages calculation, that method is limited to cases in which "the trial court instructed the jury to consider only the relative culpabilities of the plaintiff and the non-settling defendant(s) in apportioning fault under comparative negligence principles." See *McBride v. Chevron U.S.A.*, 673 So.2d 372, 380 (Miss. 1996). Clearly, this is not the case here. In the case sub judice, the trial court instructed the jury to allocate fault for the statutory employer and the settling defendant as well as Brandon and non-settling defendants. Therefore, the settlement-first method articulated in *McBride* does not apply in this case.

¶34. The jury assessed fault at 40% to Galbreath and 30% to Yale of the $3.5 million verdict. The plaintiffs in this case can recover up to 50% of the recoverable damages in this case jointly and severally from Galbreath and Yale. *See DePriest v. Barber*, 798 So.2d 456 (Miss. 2001); *Estate of Hunter v. General Motors Corp*., 729 So.2d 1264 (Miss. 1999); Miss. Code Ann. § 85-5-7(2). Since the employer was improperly included, the 15% assessed to the employer is to be divided proportionately to Galbreath and Yale as the jury has assessed. Further, Duriron's settlement was erroneously credited before damages were apportioned. Simply stated, the jury set out the percentages that each defendant was required to pay of the $3.5 million verdict together with their additional apportionment of the 15% fault assessed to the employer. Therefore, we hereby reverse and remand for a recalculation of the

apportionment of damages and reformation of the judgment consistent with this opinion.

## CONCLUSION

¶35. For the reasons discussed herein, we find no reversible error on the direct appeal by Galbreath and Yale and, therefore, affirm the judgment of the trial court. However, on the plaintiffs' cross-appeal, we reverse and remand for a recalculation of the apportionment of damages and entry of a reformed judgment in accordance with this opinion.

¶36. **AFFIRMED ON DIRECT APPEAL. REVERSED AND REMANDED ON CROSS-APPEAL.**

> **PITTMAN, C.J.,DIAZ AND EASLEY, JJ., CONCUR. CARLSON AND GRAVES, JJ., CONCUR IN RESULT ONLY. WALLER, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, P.J., AND COBB, J.**

> **WALLER, JUSTICE, DISSENTING:**

¶37. I respectfully dissent because I believe that numerous evidentiary and jury instruction errors made by the circuit court caused the jury to be biased in favor of Plaintiffs. This bias is evidenced by the jury's apportionment of only 10% liability, half of what Plaintiffs' attorneys argued was reasonable, to the deceased, and awarding damages in excess of what was requested by the Plaintiffs' attorneys in closing argument. The excessive damages and the minimal apportionment of fault to Brandon further show that the jury clearly ignored the proof at trial, including Brandon's admission that he was substantially at fault.

### A. Erroneous admission of investigative report containing hearsay.

¶38. The majority correctly finds that Ron Good's investigative report was generated in the regular course of business; however, I disagree with the majority's conclusion that the circuit court correctly introduced the entire investigative report into evidence. The part of the report of misuse by unnamed employees was hearsay that should never have come in under any circumstances, particularly where not one single witness was called at trial to document the allegations of misuse.

¶39. I believe that the trial court erred by admitting the report without redaction of portions containing hearsay pertaining to safety violations. The foundational requirements for business records are that (1) the statement is in written or recorded form; (2) the record concerns acts, events, conditions, opinions or diagnoses; (3) the record was made at or near the time of the matter recorded; (4) the source of the information had personal knowledge of the matter; (5) the record was kept in the course of regular business activity; and (6) it was the regular practice of the business activity to make the record. M.R.E. 803. *See also Flowers v. State*, 773 So. 2d 309, 331-32 (Miss. 2000). The comments to M.R.E. 803 state that there must be testimony from a foundational witness to provide evidence of the foundation requirements. *See also id.* Finally, in a case involving the admissibility of a report prepared by a police officer at the scene of an accident, we have cautioned against the use of unredacted business records:

> In holding such report admissible we should not be understood as holding all the contents of the report were necessarily admissible. For example, there may be notations in such a report which are recitations of statements of others, and would be inadmissible even though the officer were present in court testifying. The report is simply a substitute for the officer appearing in person and testifying.

*Copeland v. City of Jackson,* 548 So. 2d 970, 975 (Miss. 1989).

¶40. Under ***Copeland***, the circuit court erred by failing to redact the report to remove the portions containing inadmissible hearsay such as where Good reported that an Eka Nobel employee told him that other employees had stood on the dashboard of the forklift to dump hoppers. The hearsay contained in Good's report, along with Mrs. Brandon's hearsay testimony, constituted the only evidence of other misuse at trial, and it was highly prejudicial to Galbreath and Yale.

### B. Improper Comments on Comparative Negligence.

¶41. Yale and Galbreath complain that the circuit court's commentary on the Special Verdict Form to the jury improperly emphasized that if the jury found that Brandon was the sole proximate cause of his injuries, then Plaintiffs would not receive any damages:

> Do you find from a preponderance of the evidence that the negligence of John Wesley Brandon was the sole proximate cause of the accident? If you put yes, then you're basically finding for the defendants; that Mr. Brandon caused the whole accident and nobody else did anything else wrong and that's the end of it. You don't go any further. You are finding for the defendants, and Mrs. Brandon and them will not be awarded any damages.

Yale states that the commentary also led the jury to believe that the trial court was sympathetic to Plaintiffs. Whether or not a jury "wanted" to award damages was not relevant; whether they found that Brandon was the sole, proximate cause of the accident was relevant.

¶42. A review of the record shows that the circuit court gave other instructions which either objectively stated or supported the defendants' theory of comparative negligence. The circuit court's statements tend to show sympathy for Brandon, especially in light of the fact that the court repeated these statements a second time during its charge to the jury. While these statements constitute a proper subject for oral argument by counsel, trial courts should not comment on the effect of the findings of sole proximate cause.

### C. Denial of Jury Instruction No. DG-19

¶43. Galbreath complains that the trial court should have given its proffered instruction concerning knowledge of danger as precluding a failure to warn as follows:

> If a person knows of a danger, a warning cannot increase his awareness of its presence, and where a warning would not have prevented the harm, a failure to warn cannot be the proximate cause of the injury.

> If you believe from a preponderance of the evidence that [Brandon] knew that one should never put his body between the mast and overhead guard of a forklift while standing on the dash or cowling with the forklift engine running then a specific warning regarding the pinch point would not have increased the plaintiff's awareness of the danger. Therefore, a specific written warning about the pinch point would not have prevented the harm, and the lack of such a warning could not have been the proximate cause of the plaintiff's injury.

Jury Instruction DG-19. Galbreath argues that manufacturers are not required to warn of dangers that are open and obvious, ***Toney v. Kawasaki Heavy Indus. Ltd.***, 763 F. Supp. 1356, 1360 (S.D. Miss. 1991),

*aff'd,* 975 F.2D 162 (5th Cir. 1992), and that if the jury found that Brandon should have known not to stand on the dashboard, a warning would have been moot. The circuit court refused to give the instruction on the basis it was repetitive.

¶44. Plaintiffs argue that other instructions adequately explained that the jury could consider Brandon's "ability to avoid danger by the exercise of due care in the use of the hopper as designed"; Brandon was negligent by placing himself between the mast and the overhead guard; and the jury could find that Brandon's negligence was the sole proximate cause of his injuries and death. However, a fair reading of the instructions shows that the jury was not instructed that it could find that a failure to warn was not a proximate cause of the accident. On the other hand, the circuit court did instruct the jury that if Brandon "would have suffered the same injuries and ultimately died if the warning labels had been replaced, then the alleged failure to replace the labels should not be considered by you in determining whether Galbreath is liable under strict liability or negligence."

¶45. I believe that the jury was not adequately instructed that if it should find for Galbreath on Plaintiffs' warnings claim if it found that Brandon would have disregarded the warnings and stood on the dashboard while attempting to unlatch dashboard anyway. This instruction was fairly supported by the facts that Brandon had been instructed in the proper procedures for operating the forklift and hopper and that he had emptied a hopper by standing on the dashboard immediately prior to the accident in question.

### D. Was the verdict the result of bias, passion and prejudice?

¶46. Yale contends that the jury verdict evinced bias, passion and prejudice because the award exceeded Plaintiffs' damage request by $1.2 million and its allocation of fault to Brandon was half of that suggested by Plaintiffs' attorneys. During closing argument, Plaintiffs' counsel asked for $2,303,324 in actual damages and to assign Brandon 20% of the fault. The jury awarded $503,324 in economic damages and $2,996,676 in non-economic damages, for a total of $3.5 million, and found Brandon to be 10% at fault. While closing argument does not limit the jury from awarding more damages that requested, the jury's pronounced departure from what was requested, when compared with the evidence before the jury, certainly confirms the claims of prejudice by the defendants.

¶47. Galbreath adds that Plaintiffs failed to prove that a defect existed in the Galbreath H-150W hopper and that the jury evidently ignored Brandon's "substantial negligence," even after the court instructed them that Brandon was "negligent to some degree." Evidence was introduced at trial that Brandon admitted that he had "messed up," "took some shortcuts," "shouldn't have done what [he did]," and "was in a hurry," and that the accident was his fault. Brandon, an experienced operator, had been trained by his supervisor never to attempt to dump the hopper without another person being present to assist him. He had attended a refresher forklift safety training program six months prior to the accident where he was once again taught never to place any part of his body outside the cab of the forklift. Dr. Edward Caulfield, an expert witness testifying for Galbreath, testified that the accident was caused by Brandon's failure to follow instructions, training, and warnings. Galbreath also complains of the admission into evidence of Mrs. Brandon's testimony of common misuse by other employees was based on hearsay.

¶48. The record clearly shows that Brandon's negligence was one of the primary causes of the accident and that the dangers presented by the forklift and hopper were open and obvious. Brandon failed to wait to attempt to dump the hopper until he was assisted by a co-worker; failed to turn the engine of the forklift off before climbing up onto the dashboard; climbed up on the dashboard and positioned his feet where the

forklift controls were located; and placed himself between the mast and the body of the forklift. All of these actions were contrary to Brandon's training and experience. After the accident, Brandon himself stated that it was all his fault and that he had been in a hurry. The jury's allocation of only 10% of the fault to Brandon is contrary to the evidence and to what a reasonable allocation of fault would be.

¶49. Numerous errors during the course of the trial benefitted Plaintiffs and prejudiced Galbreath and Yale. The trial court allowed inadmissible hearsay to be admitted into evidence. And even though Galbreath and Yale were procedurally barred from presenting these claims on appeal, these errors may be considered when determining whether the verdict was the result of bias, passion and prejudice: the trial court instructed the jury that Yale "could not escape liability"; another instruction evinced the lower court's sympathy for Plaintiffs; during closing, Plaintiffs' counsel urged the jury to make Galbreath and Yale "do something" about their products and that the jury had the power to effectuate change; and Plaintiffs' counsel impermissibly argued that their expert had been involved in three other similar cases.

¶50. All of these matters add up to a trial that was infected with incompetent evidence, unfair jury instructions and impermissible closing arguments and which resulted in an unreasonable and unfair verdict and allocation of fault.

¶51. Because the jury's verdict was infected with bias and prejudice as evidenced by the jury's award which far exceeded what Plaintiffs requested in closing argument, together with a minimal assignment of contributory negligence to Brandon, I believe that the verdict and judgment of the Circuit Court of Lowndes County should be reversed and this case should be remanded for a new trial.

**SMITH, P.J. AND COBB, J., JOIN THIS OPINION.**

1. We will refer to defendants Galbreath, Incorporated; Galbreath, Inc.; The Galbreath Companies; and Galbreath-Escott, Inc., as "Galbreath."

2. The overhead guard of the forklift provides protection from objects which might fall from above. The mast of the forklift is the frame on which the forks are mounted. It is capable of being tilted back and forth. The "forks" move up and down on the mast. The tilt function of the mast operates only if the forklift engine is on.